# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SENORA W.,

        Plaintiff,

    v.

MARTIN O'MALLEY,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

No. 21 CV 4411

Magistrate Judge McShain

## MEMORANDUM OPINION AND ORDER

Plaintiff Senora W. appeals the Commissioner of Social Security's decision denying her application for benefits. For the following reasons, plaintiff's motion to reverse and remand [14][1] is granted, defendant's motion for summary judgment [18] is denied, and the decision denying the application for benefits is remanded to the agency for further administrative proceedings. 42 U.S.C. § 405(g).

## Background

On July 23, 2018, plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning on December 1, 2017. [11-1] 16. Plaintiff's claim was denied initially on December 17, 2018, and upon reconsideration on April 19, 2019. [*Id.*] Thereafter, plaintiff requested a hearing, which was held before an administrative law judge (ALJ) on July 1, 2020. [*Id.*] 34–80. In a decision dated February 3, 2021, the ALJ found that plaintiff was not disabled and denied her application. [*Id.*] 16–27. The Appeals Council denied review on June 23, 2021, rendering the ALJ's decision the final decision of the Commissioner. [*Id.*] 6. *See* 20 C.F.R. §§ 404.955 & 404.981; *Gedatus v. Saul*, 994 F.3d 893, 898 (7th Cir. 2021). Plaintiff timely appealed to this Court [1], and the Court has subject-matter jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).[2]

In evaluating a claim for disability benefits, ALJs follow a five-step, sequential process. *Apke v. Saul*, 817 F. App'x 252, 255 (7th Cir. 2020). The ALJ must evaluate the following:

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings.

[2] The parties have consented to the exercise of jurisdiction in this case by a United States Magistrate Judge [8, 9].

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner] ...; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Fetting v. Kijakazi*, 62 F.4th 332, 336 (7th Cir. 2023) (alterations in original) (quoting *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000)). *See also* 20 C.F.R. § 404.1520. "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868. The claimant bears the burden of proof at steps one through four. *Fetting*, 62 F.4th at 336 (citing *Clifford*, 227 F.3d at 868). At step five, the burden shifts to the agency. *Id.* at 336–37 (citing 20 C.F.R. § 416.960(c)(2)).

The ALJ reviewed plaintiff's disability claim in accordance with the SSA's five-step sequential evaluation process. At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since December 1, 2017, the alleged onset date. [11-1] 19. At step two, the ALJ found that plaintiff had the following severe impairments: bipolar disorder, post-traumatic stress disorder, generalized anxiety disorder, and borderline personality disorder. [*Id.*] The ALJ found that plaintiff's low vision, non-toxic goiter, pre-diabetes, history of headaches, and insomnia were non-severe impairments. [*Id.*] At step three, the ALJ found that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [*Id.*] 20. Before turning to step four, the ALJ determined that plaintiff has the residual functional capacity (RFC) to perform a full range of work at all exertional levels, but with the following nonexertional limitations: limited to simple and routine (unskilled, 1-3 step instructions); can have only brief and superficial, infrequent contact with the general public; should work primarily alone, having only infrequent contact with co-workers and occasional contact with supervisors; and can perform no fast-paced or high production quotas, and no hourly quotas. [*Id.*] 22. At step four, the ALJ concluded that plaintiff is unable to perform her past relevant work. [*Id.*] 25–26. At step five, the ALJ ruled that there are jobs that exist in significant numbers in the national economy that plaintiff can perform, including janitor (250,000 jobs), hospital cleaner (40,000 jobs), and hotel housekeeper (400,000 jobs). [*Id.*] 26–27.

## Legal Standard

Courts "apply a very deferential standard of review to the ALJ's decision." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022) (citation and internal quotations omitted). The Court must "ensur[e] that substantial evidence supported

the ALJ's decision and that the ALJ applied the correct legal standards." *Morales v. O'Malley*, 103 F.4th 469, 472 (7th Cir. 2024) (citing *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018)). *See also Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015) (stating that for the court to uphold an ALJ's decision, "it must rest on substantial evidence, *Pepper v. Colvin*, 712 F.3d 351, 361–62 (7th Cir. 2013), untainted by an erroneous credibility finding, *Murphy v. Colvin*, 759 F.3d 811, 815–16 (7th Cir. 2014)"). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021). "An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and [her] conclusions." *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023). "A reviewing court 'will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination so long as substantial evidence supports it.'" *Chavez v. O'Malley*, 96 F.4th 1016, 1021 (7th Cir. 2024) (alteration in original) (quoting *Gedatus*, 994 F.3d at 900). But "this does not mean that [courts] will simply rubber-stamp the Commissioner's decision without a critical review of the evidence." *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) (quoting *Clifford*, 227 F.3d at 869).

## Discussion

Plaintiff argues that the ALJ erred in evaluating the opinions of medical expert Dr. Allen Heinemann and that the ALJ did not evaluate plaintiff's subjective symptoms in accordance with SSR 16-3p. [14] 4–15. Plaintiff also asserts a constitutional argument that the Social Security Administration's structure violates the separation of powers and deprived plaintiff of a valid administrative adjudicatory process. [*Id.*] 15–16.

### A. The ALJ's Consideration of Dr. Heinemann's Opinions

Plaintiff first argues that the ALJ erred in evaluating the opinions of Dr. Allen Heinemann by relying on Dr. Heinemann's opinions without resolving the conflicts between his hearing testimony and his answers to a post-hearing interrogatory. [14] 4. Plaintiff contends that the ALJ was obligated to explain why she determined that Dr. Heinemann's answers to the interrogatory were more persuasive than the hearing testimony. [*Id.*] 5. According to plaintiff, the ALJ should have found a marked limitation in *both* interacting with others and in maintaining concentration, persistence, or pace (CPP). [*Id.*] 5–7. Plaintiff also asserts that this error is not harmless because if the ALJ found that Dr. Heinemann's opinion also supported a finding that plaintiff has a marked limitation in interacting with others, then plaintiff would have marked limitations in two paragraph B categories. [*Id.*] 7. And accordingly, plaintiff's mental impairments would have met Listings 12.04, 12.06, 12.08, and 12.15, resulting in a finding of disabled at step three. [*Id.*] 7–10. *See* 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.00(A)(2)(b) ("To satisfy the paragraph B

criteria, [a claimant's] mental disorder must result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning.").

The ALJ found that plaintiff has the following severe impairments: bipolar disorder, post-traumatic stress disorder, generalized anxiety disorder, and borderline personality disorder. [11-1] 19. In assessing the paragraph B criteria, the ALJ found that plaintiff has moderate limitations in interacting with others and marked limitations in CPP. [*Id.*] 20–21.[3] In crafting the RFC, the ALJ imposed the following non-exertional limitations: "limited to simple and routine (unskilled, 1-3 step instructions); can have only brief and superficial, infrequent contact with the general public; should work primarily alone, having only infrequent contact with co-workers and occasional contact with supervisors; and can perform no fast-paced or high production quotas, and no hourly quotas." [*Id.*] 22.

The ALJ summarized Dr. Heinemann's hearing testimony, noting that Dr. Heinemann testified that with respect to the B criteria, "with interacting [plaintiff] has a markedly [sic] limitation given her issues with her employers and recent treatment" and "in concentrating she has a moderate limitation . . . ." [*Id.*] 23. The ALJ stated that Dr. Heinemann further noted that plaintiff "did not meet or equal the paragraph B criteria." [*Id.*] The ALJ noted Dr. Heinemann's testimony that plaintiff could tolerate infrequent interactions with coworkers and the public, and occasional interaction with supervisors, and that plaintiff could handle detailed but not complex work tasks and end-of-day production quotas, but not hourly. [*Id.*] *See* [*id.*] 62–63 (hearing transcript).

Later in the decision, in evaluating the medical opinion evidence, the ALJ stated that she found "the opinions of Dr. Heinemann during the hearing and at Exhibit 26F persuasive." [*Id.*] 25. Exhibit 26F refers to a medical interrogatory that Dr. Heinemann filled out a day after the July 1, 2020 hearing. [11-2] 41–47. The ALJ's decision explained that plaintiff submitted or informed the ALJ about additional written evidence less than five business days before the scheduled hearing date. [11-1] 16. The ALJ admitted this evidence into the record. [*Id.*] However, because these records had not been submitted prior to the hearing date, Dr. Heinemann did not have an opportunity to review them before testifying. Thus, post-hearing, the ALJ submitted medical interrogatories to Dr. Heinemann for his opinions following review of the additional records. [*Id.*] *See* [11-2] 34–47. *See also* [11-1] 79 ("Dr. Heinemann, because the[r]e were 50 pages from Dr. Sherman that were submitted today, although several of the pages are duplicates, I am going to keep the record open and send them to you for a supplemental opinion."), 421 (post-hearing letter from plaintiff's representative at the time stating that "[t]he ME had reviewed Dr. Sherman's records only up to February 5, 2019 – 7F (with 5 sessions in early 2020 – 15F)."). The ALJ

---

[3] The ALJ also found that plaintiff has mild limitations in "understanding, remembering, or applying information" and "adapting or managing oneself." [11-1] 20–21. These areas of functioning are not at issue before the Court.

then admitted the proffered medical interrogatory and Dr. Heinemann's answers into the record. [11-1] 17 (citing [11-2] 34–47). In this supplemental, post-hearing interrogatory, Dr. Heinemann slightly altered his conclusions, opining that plaintiff had a moderate limitation in "interacting with others" and a marked limitation in CPP. [11-2] 43. Dr. Heinemann's narrative answer confirms that he took into consideration the "new" records from Dr. Sherman, citing Exhibit 23F and referring to the records from Dr. Sherman as covering the period from April 17, 2018 to June 1, 2020. [*Id.*] Dr. Heinemann reiterated his opinion that the paragraph B criteria "are not fulfilled." [*Id.*] 44. And Dr. Heinemann opined that plaintiff "is able to perform detailed but not complex tasks" and "can tolerate only infrequent contact with the public and coworkers, and occasional contact with supervisor." [*Id.*] 46.

The Court does not see any error of law in the ALJ's evaluation, nor is the Court convinced that the ALJ's findings as to the paragraph B criteria and non-exertional RFC limitations were not supported by substantial evidence. The Court does not agree that there was any conflict between Dr. Heinemann's hearing testimony and his post-hearing interrogatory answers for the ALJ to resolve. Rather, Dr. Heinemann altered his opinions based on reviewing additional evidence. Plaintiff makes much of the fact that the ALJ found *both* Dr. Heinemann's hearing testimony and answers to the interrogatory persuasive. But the ALJ's findings were not contradictory. Although Dr. Heinemann swapped his severity assessments of plaintiff's abilities in interacting with others and CPP, Dr. Heinemann still found that the paragraph B criteria were not fulfilled and his narrative opinion on plaintiff's work limitations remained largely the same: infrequent interactions/contact with coworkers and the public and occasional interaction/contact with supervisors, and detailed but not complex work tasks. *Compare* [11-1] 62–62 *with* [11-2] 43–44, 46. As noted, the ALJ ultimately adopted Dr. Heinemann's post-hearing opinions that plaintiff has a moderate limitation in interacting with others and a marked limitation in CPP. [11-1] 20–21. And the ALJ incorporated Dr. Heinemann's suggested limitations in crafting the RFC, which were the same in both Dr. Heinemann's hearing testimony and post-hearing interrogatory. [*Id.*] 22.

The ALJ did not rely solely on Dr. Heinemann's opinions. The ALJ also found the opinions of the state agency consultants "generally persuasive." [11-1] 25 (citing [*id.*] 82–112). The ALJ noted the psychological consultant's opinion that plaintiff "had mild limitations in understanding, and adapting, moderate limitations in interacting," which was "consistent with the longitudinal evidence" in the record. [*Id.*] The ALJ did not include the consultants' opinions that plaintiff had a moderate limitation in CPP. [*Id.*] 25, 89, 105. The psychological consultants opined that plaintiff retained "the ability to understand, remember and carry out at least one or two step tasks" and that plaintiff "would be best served by having work assignments requiring no contact with the public and minimal contact with co-workers and supervisors." [*Id.*] 93, 109. The only notable difference between these suggested restrictions and Dr. Heinemann's suggested restrictions is that the state agency

consultants opined that plaintiff should have *no* contact with the public and Dr. Heinemann opined that plaintiff could tolerate *infrequent* contact with the public. The ALJ ultimately adopted a restriction closer to Dr. Heinemann's, finding that plaintiff should be restricted to brief and superficial infrequent contact with the general public. [11-1] 22.

Despite plaintiff's assertions, the ALJ did not err in evaluating and adopting the opinions of Dr. Heinemann. The Court denies plaintiff's request to remand on this ground.

## B.    The ALJ's Credibility Determination

Plaintiff also argues that the ALJ failed to evaluate plaintiff's subjective symptoms in accordance with SSR 16-3p. [14] 10–15. Plaintiff identifies multiple problems with the ALJ's credibility determination, including errors in the ALJ's assessment of plaintiff's activities of daily living, treatment history, symptom improvement, and medications.

The "Court will uphold an ALJ's credibility determination unless that determination is 'patently wrong.'" *Wilder v. Kijakazi*, 22 F.4th 644, 653 (7th Cir. 2022) (quoting *Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015)). Courts have explained that an ALJ's credibility determination may be "patently wrong" where it lacks any explanation or support or is based upon errors of fact or logic. *See, e.g.*, *Minnick*, 775 F.3d at 937; *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (collecting cases). *See also Engstrand*, 788 F.3d at 660 (noting that "an ALJ still must competently explain an adverse-credibility finding with specific reasons 'supported by the record'"); *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("Like any determination by the ALJ, the findings concerning McKinzey's credibility must be supported by substantial evidence. Further, the ALJ must explain her decision in such a way that allows us to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record."). "To determine the credibility of allegations of disabling pain, an ALJ may consider several factors, including objective medical evidence and any inconsistencies between the allegations and the record." *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020). Additionally, "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," 20 C.F.R. § 404.1529(c)(3), "Social Security Ruling 16-3p explains [other] factors to consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms." *Wilder*, 22 F.4th at 653 (citing 2017 WL 5180304 (Oct. 25, 2017); 20 C.F.R. § 404.1529). These factors include daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate symptoms; and treatment, other than medication, that an individual receives or has received. SSR 16-3p, 2017

WL 5180304, at *7–8; 20 C.F.R. § 404.1529(c)(3). The regulations mandate that an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10.

In evaluating plaintiff's subjective symptoms, the ALJ found that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" [11-1] 23. The ALJ summarized plaintiff's hearing testimony, some of which the ALJ also acknowledged earlier in assessing the paragraph B criteria:

> At the hearing, she testified that she is unable to work due to the stress and pressure of working after working for a month. The claimant noted that in every single job she has felt she is being watched and the job only lasts for about a month. She testified that working with management and coworkers causes her a lot of stress. She also testified that she has tried doing simple jobs and feels that she still has to interact with people. The claimant indicated that at her last job she had minimal contact with people and still had issues. The claimant testified that where she was placed she was not supposed to interact with others and she still had issues. She noted that she her [sic] mental conditions cause her to feel angry and like she cannot respond the way she wants to, she feels monitored, and like she is not being heard. She noted that she gets into verbal altercations with people, strangers and familiar people, a lot. (Hearing Testimony).

[Id.] 22–23. As the ALJ's summary demonstrates, plaintiff focused most of her hearing testimony on her social struggles and difficulty interacting with others. The ALJ also summarized Dr. Heinemann's hearing testimony, [id.] 23, and the medical evidence in the record, [id.] 23–24. In conducting the credibility determination, the ALJ's decision primarily assessed two large categories: (1) treatment history and medications and (2) activities of daily living. [Id.] 24.

As detailed below, the Court finds that the ALJ's subjective symptom analysis, as well as the ALJ's articulation of her credibility determination, are flawed in a number of ways. The standard is high for a plaintiff to show that an ALJ's credibility determination is "patently wrong." And some Seventh Circuit cases have found that "flaws in the ALJ's reasoning are not enough to undermine the ALJ's decision that [a claimant] was exaggerating her symptoms" because "[n]ot all of the ALJ's reasons must be valid as long as *enough* of them are[.]" *Halsell v. Astrue*, 357 F. App'x 717, 722–23 (7th Cir. 2009) (emphasis in original) (citing *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)). *See also*

*Tutwiler v. Kijakazi*, 87 F.4th 853, 859 (7th Cir. 2023) ("Although the ALJ might have erred in his analysis of some factors, enough of them had adequate supporting evidence for this court to uphold his credibility determination."). But on this record and given the cumulative nature of the ALJ's errors in assessing plaintiff's subjective symptoms, the Court concludes that remand is required. *See, e.g., Stafford v. Saul*, No. 18-cv-3016, 2019 WL 5963632, at *5 (N.D. Ill. Nov. 13, 2019) ("In this case, by contrast, it is not clear to the Court that the ALJ's conclusion on the 'highly subjective' determination of fault would have been the same but for the problems discussed above.").

First, the ALJ did not fulfill her duty under the regulations to consider reasons that there may be gaps in plaintiff's treatment record before finding plaintiff's symptoms inconsistent with the record evidence on this basis. This error alone requires remand. Additionally, plaintiff raises concerns with the ALJ's reliance on plaintiff's lack of recent in-patient hospitalizations, emergency treatment, or suicidal or homicidal thoughts; the fact that plaintiff's conditions have not worsened; instances in the record where plaintiff's symptoms showed improvement; and plaintiff's ability to engage in certain activities of daily living. The Court agrees that the ALJ's reliance on and conclusions drawn from these observations in considering plaintiff's subjective symptoms were flawed and not well supported. And the ALJ failed to consider other regulatory factors under SSR 16-3p, such as "factors that precipitate and aggravate the symptoms." The ALJ's decision did not adequately "confront the evidence that does not support her conclusion and explain why that evidence was rejected." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). Taken together, all of these flaws persuade the Court that the ALJ's credibility determination was erroneous and not supported by substantial evidence.

## 1. Treatment History and Medications

First, the ALJ found that despite plaintiff's ongoing treatment, "the medical evidence does not corroborate the severity of" plaintiff's mental impairments. [11-1] 24. In support of this conclusion, the ALJ stated that "the evidence shows that there are significant gaps in the claimant seeking specialized mental health assistance from a physician." [11-1] 24. However, the ALJ provided no citation to support this statement and it is not clear to the Court what time period the ALJ is referring to or which records demonstrate this "significant gap." "An ALJ need not . . . cite support for every proposition or chain of reasoning." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024). But this is a notable observation that the ALJ does not mention anywhere else in the decision. Without more, this is not sufficient to allow a reviewing court "to assess the validity of the agency's ultimate findings and afford [plaintiff] meaningful judicial review." *Id.* (quoting *Moore*, 743 F.3d at 1121). *See also Hernandez v. Colvin*, No. 13 CV 1955, 2014 WL 4784076, at *5 (N.D. Ill. Sept. 25, 2014) ("More troubling still is that the ALJ's statement is wholly unsupported by

citation to any record evidence, so there is no way for the court to track which medical records the ALJ was referencing in characterizing her condition as improving.").

Nor did the ALJ question plaintiff about these "gaps" at the hearing, or even refer to any such gaps. SSR 16-3p acknowledges that "if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." 2017 WL 5180304, at *9. But the regulation also instructs that ALJs "will not find an individual's symptoms inconsistent with the evidence in the record on this basis *without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.*" *Id.* (emphasis added). *See also Deborah M. v. Saul*, 994 F.3d 785, 790 (7th Cir. 2021) (noting that SSR 16-3p "provides that an ALJ must consider possible reasons for a failure to seek treatment"). Courts[4] and SSR 16-3p recognize a variety of reasons why individuals do not comply with or seek treatment in a manner consistent with their complaints, including lack of insurance, lack of access, inability to afford treatment, side effects, religious beliefs, *etc.* 2017 WL 5180304, at *9–10. Possible reasons may also be directly related to the fact that the individual suffers from one or more mental impairments. The regulations recognize, for example, that "an individual may not understand the appropriate treatment for or the need for consistent treatment of his or her impairment" or that due to a mental impairment, "an individual may not be aware that he or she has a disorder that requires treatment." SSR 16-3p, 2017 WL 5180304, at *10. "The Seventh Circuit has emphasized that 'mental illness in general and bipolar disorder in particular . . . may prevent the sufferer from . . . submitting to treatment.'" *Barnes v. Colvin*, 80 F.Supp.3d 881, 886 (N.D. Ill. 2015) (alterations in original) (quoting *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006)).[5] *See also Rebecca S. v. Saul*, 19-cv-233, 2020 WL 13605182, at *8 (S.D. Ind. Aug. 31, 2020) ("The Seventh Circuit has joined the circuits above in holding that an ALJ's minimum duty to consider possible explanations for noncompliance issues—before drawing a negative credibility inference—is heightened with claimants that have significant mental impairments."). Accordingly, "ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference." *Jelinek v.*

---

[4] *See, e.g., Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) ("There may be a reasonable explanation behind Murphy's actions, such as she may not have been able to afford the treatment, further treatment would have been ineffective, or the treatment created intolerable side effects."); *Orienti v. Astrue*, 958 F.Supp.2d 961, 977 (N.D. Ill. 2013) ("ALJs have a duty to consider factors like inability to travel, mental illness, or economic constraints that may have prevented claimants from seeking receiving medical care.").

[5] *See Robert D. v. Kijakazi*, 23-cv-90, 2023 WL 6476066, at *4 (N.D. Ind. Oct. 5, 2023); *Alexis G. v. Saul*, 20-cv-143, 2021 WL 870813, at *7 (N.D. Ind. Mar. 9, 2021). *See also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) ("For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself.") (citing *Pate–Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009)).

*Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) (collecting cases). Despite these instructions, there is no indication that the ALJ considered reasons why there may be "significant gaps" in plaintiff's efforts to seek "specialized mental health assistance from a physician." Therefore, the ALJ committed an error of law in failing to conduct this portion of her credibility assessment in accordance with the agency's regulations and remand is required.[6]

Although this error is alone enough to require remand, plaintiff raises several other concerns with the ALJ's assessment of plaintiff's treatment history in evaluating her subjective symptoms. For example, the ALJ also observed that "[t]he record does not contain any evidence of recent in-patient hospitalizations for psychiatric issues, nor is there any emergency treatment for" plaintiff's mental impairments "or worsening bipolar disorder; post-traumatic stress disorder ('PTSD'); generalized anxiety disorder; and borderline personality disorder during the adjudicatory period." [11-1] 24. The ALJ then noted that "the record shows that the claimant has consistently denied any suicidal or homicidal thoughts." [*Id.*] Elsewhere in the decision, the ALJ stated that plaintiff noted she has not stayed overnight at a hospital in the last two years. [*Id.*] *See* [*id.*] 53–54 (hearing testimony). Plaintiff argues that the ALJ erred in this evaluation of her treatment history and that the ALJ should not have found plaintiff's lack of recent hospitalization inconsistent with her symptom allegations. [14] 13–14.

The ALJ's reliance on these statements to support a finding that plaintiff's symptoms are not as disabling as alleged gives the Court pause. It is appropriate for the ALJ to consider plaintiff's level of treatment, but the Court does not track how a lack of recent in-patient hospitalizations, emergency treatment, or suicidal or homicidal thoughts demonstrate that the medical evidence does not corroborate the severity of plaintiff's alleged mental impairments. "[T]his circuit has cautioned against relying on a claimant's lack of psychiatric hospitalizations as evidence against a finding of disability." *Pamela Z. v. O'Malley*, No. 21 CV 3270, 2024 WL 1858450, at *4 (N.D. Ill. Apr. 29, 2024). "[A] lack of inpatient treatment does not necessarily indicate that a claimant 'is therefore capable of gainful employment.'" *Martinez v. Kijakazi*, 71 F.4th 1076, 1083 (7th Cir. 2023) (quoting *Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015)). After all, "[t]he institutionalization of the mentally ill is generally reserved for persons who are suicidal, otherwise violent, demented, or (for whatever reason) incapable of taking even elementary care of themselves." *Voigt*,

---

[6] *See, e.g.*, *Thomas v. Colvin*, 826 F.3d 953, 960 (7th Cir. 2016) ("The ALJ also noted Thomas's gap in treatment between August 2011 and September 2012, but . . . the ALJ did not explore the reasons for this gap."); *Murphy*, 759 F.3d at 816 ("However, we cannot assess the validity of the ALJ's credibility determination because the ALJ did not ask important questions to determine if Murphy's actions were justifiable."); *Jones v. Colvin*, No. 15 C 11310, 2016 WL 4798956, at *5 (N.D. Ill. Sept. 14, 2016) ("The ALJ's failure to explain how he considered Plaintiff's explanations for his gaps in treatment is an error requiring remand."); *Potysman v. Colvin*, 218 F.Supp.3d 782, 788 (N.D. Ind. 2016) ("Because the ALJ is required to inquire about a claimant's reasons for not seeking treatment, his failure to do so is an error requiring remand.").

781 F.3d at 876. Like in the *Voigt* case, plaintiff "is none of these things . . . [b]ut it doesn't follow, as the administrative law judge may have thought, that [plaintiff] is therefore capable of gainful employment." 781 F.3d at 876. *See also Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) ("And the fact that Punzio is no longer suicidal and is not plagued by depression 24 hours a day says little about her abilities to understand and remember short instructions and to maintain attention for a two-hour segment."); *Mattson v. Berryhill*, No. 16 C 10533, 2017 WL 5011890, at *5 (N.D. Ill. Nov. 2, 2017) (noting that "[i]t is plausible that one may be unable to work but not need psychiatric hospitalization"); *Seals v. Saul*, No. 19-C-1244, 2020 WL 5229679, at *10 (E.D. Wis. Sept. 2, 2020) ("It does not follow that a person who avoids that level of care is capable of gainful employment."); *Adams v. Berryhill*, No. 17-cv-47, 2017 WL 4349718, at *12 (N.D. Ind. Oct. 2, 2017) ("While inpatient hospitalization can be indicative of serious mental health symptoms, a lack of hospitalization does not necessarily mean that the individual's symptoms are not disabling.").[7] That an individual's mental impairments and symptoms are not so severe as to require hospitalization/emergency treatment or that an individual's symptoms do not include suicidal or homicidal thoughts does not necessarily mean that the individual does not experience disabling symptoms. To suggest that it does ignores the reality that psychological conditions and their accompanying symptoms exist on a wide spectrum such that it is illogical to say that if an individual does not fall on the severe end, then she is capable of gainful employment. An ALJ is required to articulate how and why cited evidence and observations detract from the veracity of a claimant's testimony and symptom allegations. The Court is not persuaded that the ALJ adequately did so in relying on these statements. Nor did the ALJ explain how the fact that plaintiff's impairments did not worsen demonstrates that plaintiff's symptoms are not as disabling as alleged or why this is a reason to doubt plaintiff's credibility; the Court cannot follow this logic.

Furthermore, plaintiff argues that the ALJ erred in relying on purported improvement in plaintiff's impairments to find plaintiff's allegations inconsistent

---

[7] The Commissioner disagrees with plaintiff's assertions and argues that "an ALJ may properly consider facts such as a lack of psychiatric hospitalizations in evaluating a claimant's allegations about mental impairments." [18] 20 (citing *Elizabeth A. D. v. Saul*, No. 19 C 6024, 2021 WL 148831, at *13 (N.D. Ill. Jan. 15, 2021)). But the case the Commissioner cites in support also acknowledges the line of cases cautioning that a lack of psychiatric hospitalizations does not necessarily mean an individual can perform full-time work. *Elizabeth A. D.*, 2021 WL 148831, at *13 (collecting cases). Furthermore, that case is factually distinguishable. The ALJ found the claimant disabled for a certain period during which the claimant had six psychiatric hospitalizations. *Id.* at *1, 3, 9. However, the ALJ then determined that the claimant had experienced medical improvement in her condition related to her ability to work as of a certain date and was no longer disabled. *Id.* at *1. In making this finding, the ALJ considered the absence of psychiatric hospitalizations, which was appropriate and logical to do given the claimant's history. In reviewing the ALJ's decision, the court agreed that "[a]lthough it is true that the absence of psychiatric hospitalizations standing alone does not necessarily mean an individual does not met [sic] or equal a listed impairment or is able to work, it may suggest less severe symptoms managed with more conservative treatment *where a claimant has a history [of] hospitalizations.*" *Id.* at *6 (emphasis added). Those circumstances and facts are not present here.

with the record. [14] 12–13. The ALJ's decision heavily relies on observations that plaintiff's conditions and symptoms are improving. Earlier in the decision, in summarizing the record evidence, the ALJ acknowledged that plaintiff "had been receiving treatment for her mental condition and has been prescribed medication." [11-1] 23. Specifically, the ALJ noted that plaintiff's medications include risperidone, Xanax, Lexapro, and Zyprexa. [*Id.*] (citing [*id.*] 444, 598; [11-2] 29).[8] The ALJ also discussed programs plaintiff participated in during the summer of 2018 and the results:

> From July 25, 2018 to August 7, 2018, the claimant attended 7 days of a partial hospitalization program and from August 9, 2018 to September 5, 2018, she attended 15 days of an intensive outpatient program. After she completed the program, it was noted that although she continues to experience suspiciousness of others and anger outbursts, she appeared to gain insight into cognitive distortions and how these impact the way she perceives relationship interactions and her environment. It was also noted that she improved on her coping skills. (3F/2).

[*Id.*] (citing [*id.*] 461). The ALJ pointed to a progress note from the last day of the program stating that plaintiff "was feeling proud that she has been able to deal with some of her anger issues much better." [*Id.*] (citing [*id.*] 456). The ALJ observed plaintiff's reports that "she was sleeping better recently with the change of medications and her mood has been better." [*Id.*] 24 (citing [*id.*] 597, 715, 738). And later in the decision, the ALJ noted that plaintiff testified that the medications she had been prescribed were working. [*Id.*] 24. *See* [*id.*] 51 (plaintiff's testimony that she feels like therapy is helping her), 52 (plaintiff's testimony that she feels like her prescribed medications help her). *But see* [*id.*] 52 (adding that "sometimes when I take that medicine when things get too intense, I have to take extra").

Plaintiff's progress, treatment history, and medications are all valid considerations for the ALJ in making a credibility determination. As noted, the regulations specifically include medications and other treatment an individual receives or has received in the list of factors for ALJs to consider. SSR 16-3p, 2017 WL 5180304, at *7–8; 20 C.F.R. § 404.1529(c)(3). But plaintiff argues that the ALJ

---

[8] Plaintiff's brief includes a separate section arguing that although the ALJ acknowledged these medications, the ALJ should have found that the treatment plaintiff was undergoing (such as prescriptions for antipsychotic and antidepressant medications) should have lent credence to plaintiff's alleged symptoms. [14] 14–15. SSR 16-3p does state that ALJs "will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed" and that "[p]ersistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." SSR 16-3p, 2017 WL 5180304, at *9. But the ALJ *did* credit plaintiff's treatment, finding that plaintiff's "ongoing treatment results in some limitations" and accordingly including certain restrictions in the RFC to account for plaintiff's psychological conditions. [11-1] 24.

failed to consider certain record evidence that would have shown that plaintiff's "capacity did not improve[] to the point that she could interact with others in a competitive work environment." [14] 13. Specifically, plaintiff highlights records that she asserts demonstrates her angry mood, irritation, or agitation; ruminations, flashbacks, intrusive thoughts, intrusive and distressing memories, or distressing dreams; trust issues, paranoia, delusional thoughts, suspicion of others, or hypervigilance; mood instability, impulsive behavior, loss of control, or difficulty controlling anger; and social isolation, difficulties with social interactions, poor relations with coworkers, quick agitation at group therapy, and conflict with authority. [*Id.*]

The Court cannot conclude that the ALJ failed to consider this record evidence.[9] The ALJ's decision *did* cite all of these records, either generally or to the specific pages plaintiff emphasizes. Furthermore, the ALJ did acknowledge these symptoms of plaintiff's psychological impairments, although wording it as symptoms that plaintiff's mental conditions "allegedly cause" rather than as evidence in the record:

> The claimant was diagnosed with bipolar disorder; post-traumatic stress disorder ("PTSD"); generalized anxiety disorder; and borderline personality disorder. (1F-4F, 7F-13F, 15F-18F, 23F-24F generally). The claimant's psychological conditions allegedly cause her severe symptoms such as depression, isolation, insomnia, anger, social withdrawal, low energy/fatigue, hopelessness, worthlessness/low self-esteem, apathetic, irritable, fear, restlessness, tension, overwhelmed, intrusive memories, distressing dreams, flashbacks, hypervigilance, and anxiety. (17F/3; 16F/12; 1F-4F, 7F-13F, 15F-18F, 23F-24F generally).

[11-1] 23. But the ALJ appears to have been more convinced by plaintiff's "normal mental status examination findings including normal memory, cooperation, normal concentration and attention, as well as normal mood and grooming." [*Id.*] 23–24 (citing [*id.*] 441, 445, 498, 502, 505, 520, 597, 614, 677, 726, 760–61). *See also* [*id.*] 20–21 (finding the medical evidence shows plaintiff "had a good rapport with providers and was described as pleasant and cooperative"), 25 (finding the state agency consultant opinions consistent with record evidence of "negative findings including generally normal memory, cooperation, and grooming").

However, it is important to recognize that "[t]here can be a great distance between a patient who responds to treatment and one who is able to enter the

---

[9] The Court does agree that the ALJ's articulation leaves something to be desired. There is not much discussion of or engagement with these records in the decision, but "[a]n ALJ need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning." *Warnell*, 97 F.4th at 1053.

workforce[.]" *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011).[10] "The key is not whether one has improved (although that is important), but whether they have improved enough to meet the legal criteria of not being classified as disabled." *Jarnutowski*, 48 F.4th at 773 (quoting *Murphy*, 759 F.3d at 819). *See also Martz v. Comm'r, Soc. Sec. Admin.*, 649 F. App'x 948, 960 (11th Cir. 2016) (noting that "improvement is a relative concept and, by itself, does not convey whether or not a patient has recovered sufficiently to no longer be deemed unable to perform particular work on a sustained basis"). This can be an especially crucial consideration in the mental health context. The Seventh Circuit has "often observed that bipolar disorder . . . is by nature episodic and admits to regular fluctuations even under proper treatment." *Jelinek*, 662 F.3d at 814 (collecting cases). *See also Scott*, 647 F.3d at 739–40 ("Moreover, the ALJ's analysis reveals an all-too-common misunderstanding of mental illness. The very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a 'good day' does not imply that the condition has been treated."); *Phillips v. Astrue*, 413 F. App'x 878, 886 (7th Cir. 2010) ("Many mental illnesses are characterized by 'good days and bad days,' rapid fluctuations in mood, or recurrent cycles of waxing and waning symptoms."). Therefore, an ALJ should proceed with caution in relying on normal mental status examination findings and improvement with treatment/medication to find that a claimant's symptoms are not as severe as alleged and that she is capable of gainful employment:

> A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job.

*Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). At the very least, an ALJ must articulate how and why she weighed record evidence of a claimant's "good days" more heavily than evidence of a claimant's "bad days" in assessing her allegations of disabling symptoms.

Despite certain evidence in the record, it is not entirely clear that the ALJ took these considerations into account when assessing plaintiff's treatment history in relation to her credibility and subjective symptoms. For example, in finding that plaintiff has a moderate limitation in interacting with others, the ALJ noted that plaintiff reported at a November 2019 treatment visit "that she was starting to relate to others with the help of her children, such as when they get invited to parties or engaging in school functions." [11-1] 21 (citing [*id.*] 673). But that same record also

---

[10] In *Scott*, for example, the Seventh Circuit pointed out that treatment notes showed that "although [plaintiff] had improved with treatment, she nevertheless continued to frequently experience bouts of crying and feelings of paranoia." *Scott*, 647 F.3d at 740. The court criticized the ALJ for cherry-picking "from those mixed results to support a denial of benefits." *Id.*

noted that plaintiff was still struggling with multiple issues, including that she reports a lack of patience, that she becomes angry or irritable when there is too much stimulation, and that she has a "'bad habit of reacting' out of emotion to situations and it affects her as she may say something." [*Id.*] 673. Furthermore, this observation may demonstrate possible improvement in plaintiff's symptoms and abilities in certain settings, but that does not necessarily translate into how plaintiff would fare in a work setting. *See also* [11-1] 761 (May 2020 therapy note on plaintiff's progress in group therapy indicating that plaintiff stated "her learning has been 'shakey'" and that "she is able to capture and understand the concepts and skills but continues to struggle in applying them 'in the moment'"). Similarly, although the ALJ noted that plaintiff reported "feeling proud that she has been able to deal with some of her anger issues much better" after completing the partial hospitalization and intensive outpatient programs, the ALJ did not acknowledge plaintiff's reports in that same note that she was "concerned about the fact that she's leaving the program and will not have the protective shield for her emotional acting out." [11-1] 23 (citing [*id.*] 456). As the Court discusses below in more detail, *see infra* Section B.3, the controlled and comfortable setting of a mental health clinic is entirely different from most work environments.

For these reasons, the Court finds that the ALJ erred in assessing plaintiff's treatment history pursuant to SSR 16-3p and remand is required.

## 2. Activities of Daily Living

Second, the ALJ's decision dedicated a paragraph to assessing plaintiff's activities of daily living, finding that plaintiff's "continued engagement in a large number of activities of daily are [sic] inconsistent with disability." [11-1] 24. The ALJ noted that plaintiff is able to drive and go to the grocery stores, and that plaintiff lives with her husband and four children, ages 4, 7, 9, 15. [*Id.*] "She noted that on a typical day, she will get her kids out of bed and ready for the day, she was getting them to brush their teeth, and she will spend the day writing, watching the news or going on Facebook, and going for walks." [*Id.*] The ALJ acknowledged plaintiff's testimony that "prior to [the] pandemic she would go to a nearby Panera bread and spend her time writing," and that "she will the clean the house, including the dishes and laundry every-so-often." [*Id.*] The ALJ also pointed to evidence in the record that plaintiff is "able to drive, spends her day writing, including poetry, and walking, can bathe and dress, can do house chores, and exercising for 30 minutes daily." [*Id.*] (citing [*id.*] 598, 603, 762; [11-2] 30). The ALJ also noted that plaintiff has a dog and "was assisting her husband's care by driving him to medical appointments at the VA." [11-1] 24 (citing [*id.*] 478, 483, 490).

Plaintiff argues that the ALJ erred in evaluating her activities of daily living— including that she was able to drive, go to the grocery store, clean her home, watch TV, bathe, and dress—because the ALJ failed to explain or analyze how these

activities were inconsistent with plaintiff's other statements or the medical evidence. [14] 10–11. Plaintiff also asserts that the ALJ's relevant inquiry was not whether plaintiff could sporadically engage in basic activities of daily living, but whether she could perform full-time work. [*Id.*] 12. Plaintiff highlights that she is only able to engage in these activities because at home, she can perform them at her own pace, taking frequent breaks and without meeting workplace standards. [*Id.*] Plaintiff contends that because she cannot complete even household chores without experiencing ruminations, flashbacks, or paranoia, she is not able to perform work tasks in a competitive workplace. [*Id.*] (citing *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)).

It is well-established that considering a claimant's daily activities when evaluating credibility must be done with care, and the Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) (collecting cases). *See also Prill v. Kijakazi*, 23 F.4th 738, 748 (7th Cir. 2022) ("Indeed, this court has 'cautioned ALJs not to equate such activities with the rigorous demands of the workplace.'") (quoting *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016)); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("We have cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home.") (collecting cases). Here, the ALJ's decision did not explicitly equate activities of daily living with the demands of a full-time job. But "[t]he ALJ's failure to even acknowledge this principle is disappointing." *Denise F. v. O'Malley*, No. 18 C 5195, 2024 WL 867070, at *18 (N.D. Ill. Feb. 29, 2024). *Cf. Deborah M.*, 994 F.3d at 791 (upholding decision where ALJ stated that, "[w]hile [daily] activities are not being compared to actual work situations, I do not consider evidence regarding the claimant's daily activities as sufficient to establish that she is unable to function at the level I have assessed").

As previously discussed, *see supra* Section B.1, this is especially important to consider when the impairments at issue are psychological conditions that by their very nature are episodic and may cause fluctuations in an individual's symptoms, resulting in "good days" and "bad days." *Jelinek*, 662 F.3d at 814; *Scott*, 647 F.3d at 739–40; *Phillips*, 413 F. App'x at 886. Although an individual may be able to engage in certain activities of daily living on "good days" with no consequences if they are not able to on "bad days," such a finding does not translate to the competitive work environment in which individuals must be productive regardless of "good days" and "bad days." "The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work." *Mendez*, 439 F.3d at 362. A claimant's "ability to struggle through the activities of daily living does not mean that she can manage the requirements of a modern workplace." *Punzio*, 630 F.3d at 712.

Here, for example, plaintiff's February 2019 function report indicates that she shops for groceries, prescriptions, and medical items, but also explains that she has to stop and take breaks while shopping, that it is hard for her to concentrate while shopping, shopping when the store is crowded makes her anxious so she shops at "off peak times," and she has to rest when she gets home from shopping. [11-1] 386. The ALJ's decision did not include any discussion of those qualifications. [11-1] 20, 24, 25. *See Denise F.*, 2024 WL 867070, at *18 (finding that the ALJ's summary of the plaintiff's daily activities omitted at least some important qualifications as to how she carried out those activities).

Additionally, although plaintiff is capable of performing certain other household tasks and chores, the record clearly demonstrates that she does them when she is able and at her own pace, something that would not be allowed in typical work environments. Plaintiff's February 2019 function report indicates that she does not cook or otherwise prepare meals, but that she does "straighten up around the house" and wash dishes one to two times a week, as well as takes out the trash and does laundry monthly. [11-1] 384–85. But plaintiff also reported that she needs help or encouragement in completing chores and that she often forgets about tasks she has started, needs frequent rest breaks, and gets distracted easily. [*Id.*] 385, 389. Plaintiff's hearing testimony confirmed that she cleans the house, does the dishes using a dishwasher, and does laundry "every so often" and "every now and then." [11-1] 57. When questioned by the ALJ about who does all the chores, then, plaintiff indicated that her two oldest children and her husband, who is a disabled veteran and does not work, [*id.*] 40, do most of the upkeep and chores:

> Q. So if you're not doing these, who is doing these, who is doing these chores?
>
> A. My son and my husband.
>
> Q. So your disabled husband is able to do all these chores?
>
> A. He helps. Basically, the 15-year-old and the 9-year-old is helping majority of the time. And he – what he talked to – my husband, what he talked to about with his doctor is trying to move around. So they try to encourage him to move around.

[*Id.*] 57. Plaintiff's husband also completed a third party function report, which the ALJ cited generally by exhibit number but did not explicitly discuss or evaluate. In this form, plaintiff's husband stated that he helps plaintiff with her needs and supports her every day. [11-1] 356. The ALJ's decision did not articulate consideration of any of these conditions on plaintiff's ability to complete chores and housework. Plaintiff may be able to engage in these activities and tasks at times, but "working

sporadically or performing household chores are not inconsistent with being unable to engage in substantial gainful activity." *Engstrand*, 788 F.3d at 661.

Plaintiff also argues that the ALJ erred in finding plaintiff's testimony regarding taking care of her children inconsistent with her alleged limitations. [14] 11–12. Plaintiff asserts that the ALJ did not explain how providing basic care to her children supported a finding that plaintiff exaggerated her flashbacks or paranoia. [*Id.*] 12. "The ability to care for children does not equate to the ability to work full-time outside the home." *Spaulding v. Astrue*, No. 11 C 2926, 2012 WL 3308881, at *4 (N.D. Ill. Aug. 13, 2021) (citing *Gentle v. Barnhart*, 430 F.3d 865, 867–68 (7th Cir. 2005)). The Seventh Circuit "has specifically warned against reliance on child care," *Seals*, 2020 WL 5229679, at *10, finding that an ALJ's "casual equating of household work to work in the labor market cannot stand." *Gentle*, 430 F.3d at 867. After all, an individual "*must* take care of her children, or else abandon them to foster care . . . and the choice may impel her to heroic efforts." *Id.* (emphasis in original). *See also Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014) (stating the court has "urged caution in equating these activities with the challenges of daily employment in a competitive environment, especially when the claimant is caring for a family member"); *Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010) (noting that the *Gentle* court held that "an ability to work full time could not be inferred" from babysitting); *Gentle*, 430 F.3d at 867 ("A more important point is that taking care of an infant, although demanding, has a degree of flexibility that work in the workplace does not."). The record also reflects that any ability plaintiff does have to care for her children may not always be without limitations attributable to her psychological conditions. For example, even when at home and caring for her children, plaintiff reported to treatment providers that "she can get very frustrated with her children" and that she lacks patience. [11-1] 673.

Furthermore, the Court is not convinced that the record, including plaintiff's testimony, reflects the level of childcare the ALJ suggests plaintiff was providing. The ALJ repeatedly refers to plaintiff's "ability to care for her herself [sic], children, and husband." [11-1] 24, 25. For example, earlier in the decision, in assessing the paragraph B criteria, the ALJ noted that plaintiff "stated that she is able to . . . care for young children, and care for her husband." [11-1] 21 (citing [*id.*] 346–54, 356–63, 379–80, 381–92). In support, the ALJ cited plaintiff's hearing testimony, plaintiff's two function reports, and plaintiff's husband's function report. However, plaintiff's hearing testimony only indicated that in the morning, she has "the kids brush their teeth" or tries to get them to do it, but also commented that "[i]t's not easy." [*Id.*] 56. Aside from that, plaintiff only otherwise mentioned that she takes her kids to the front of the house in the grass. [*Id.*] 42. There is no hearing testimony from plaintiff that she did more than this to "get her kids out of bed and ready for the day" and the ALJ did not cite any additional record evidence in support of this conclusion. Furthermore, plaintiff indicated in both of her function reports (October 2018 and February 2019) that she does not "take care of anyone else such as a wife/husband,

18

children, grandchildren," *etc.* or any pets. [11-1] 347, 383. As plaintiff points out, [14] 11, she stated in her October 2018 function report that her oldest son takes care of other people and animals in the household. [11-1] 347. Additionally, beyond noting that plaintiff "was assisting her husband's care by driving him to medical appointments at the VA," [11-1] 24, 490, the ALJ did not include any other record citations or examples of how plaintiff cares for her husband. If anything, as the previous discussion emphasizes, plaintiff's husband is the one caring for her, not the other way around. *See Gentle*, 430 F.3d at 867 ("Uncontested evidence not mentioned by the administrative law judge reveals that she performs these chores with difficulty, and with the aid of her sister, a neighbor, and another woman."); *Louis P. v. Saul*, No. 18 CV 8486, 2020 WL 6044286, at *9 (N.D. Ill. Oct. 13, 2020) ("On this record, the Court is left wondering how the ALJ believed Claimant's minimal daily activities, performed with limitations, translate to an ability to perform full-time work.").

For these reasons, the Court finds that the ALJ's assessment of plaintiff's activities of daily living is flawed and not well supported. Although it may not rise to the level of "patently wrong" and independently require remand, as the Court is remanding for other reasons, the ALJ is encouraged to take the Court's observations into consideration and reassess or more fully explain her reasoning regarding plaintiff's activities of daily living in evaluating plaintiff's subjective symptoms pursuant to SSR 16-3p.

### 3. Other Regulatory Factors

The Court notes that in addition to the issues identified regarding the ALJ's evaluation, the ALJ also "made no attempt to analyze the remaining regulatory factors." *Darlene M. v. Kijakazi*, No. 19 CV 6389, 2021 WL 3773291, at *4 (N.D. Ill. Aug. 25, 2021). Of course, "an ALJ is not required to provide a complete and written evaluation of every piece of testimony and evidence," *Minnick*, 775 F.3d at 935, and "exhaustive articulation of [the regulatory] factors is not required," *Darlene M.*, 2021 WL 3773291, at *4. And the ALJ's decision did include boilerplate language that in making her RFC determination, she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p." [11-1] 22. Nevertheless, "the ALJ must do more than merely cite the factors." *Darlene M.*, 2021 WL 3773291, at *4. *See Bonnie F. v. Saul*, No. 18 CV 50417, 2020 WL 3414948, at *5 n.5 (N.D. Ill. June 22, 2020) ("Citing the factors without explanation is not enough.") (citing *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002)). The administration's guidelines make it clear that it is "not enough for [ALJs] simply to recite the factors described in the regulations for evaluating symptoms." SSR 16-3p, 2017 WL 5180304, at *10. Rather, the "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any

subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.*

The guidelines also acknowledge that ALJs will only "discuss the factors pertinent to the evidence of record" and, accordingly, "[i]f there is no information in the evidence of record regarding one of the factors," the ALJ "will not discuss that specific factor in the determination or decision because it is not relevant to the case." SSR 16-3p, 2017 WL 5180304, at *8. However, the Court finds there is evidence in the record related to other regulatory factors that should have been articulated in the ALJ's decision, namely, factors that precipitate and aggravate the claimant's symptoms. SSR 16-3p, 2017 WL 5180304, at *7; 20 C.F.R. § 404.1529(c)(3)(iii). The ALJ did not discuss situations or settings that may worsen or trigger plaintiff's symptoms. For example, plaintiff explained at a November 2019 visit that she "often flee[s] from situations when she feel[s] very uncomfortable" and that she "reports becoming angry or irritable when there is too much stimulation." [11-1] 673. A note from May 2020 on plaintiff's progress in group therapy indicates that plaintiff stated "her learning has been 'shakey'" and that "she is able to capture and understand the concepts and skills but continues to struggle in applying them 'in the moment.'" [*Id.*] 761. And plaintiff stated in her function report that in handling stress, she becomes anxious and irritable, lacks concentration, feels overwhelmed, and has a panic attack. [*Id.*] 390. "[A]n ALJ doesn't need to address every piece of evidence, but he or she can't ignore a line of evidence supporting a finding of disability." *Deborah M.*, 994 F.3d at 791.

Some evidence indicates that much of plaintiff's stress and triggers arise from the work environment. The record demonstrates that plaintiff has a history of identifying "stress from work" as one of her target symptoms and treatment notes throughout the years include "work stress" as a recurring issue discussed during plaintiff's therapy sessions. *See, e.g.*, [11-1] 553, 579, 582, 787. *See also* [*id.*] 554 (noting that plaintiff had "started her absence from work, which has helped decrease her anxiety"). Plaintiff also testified at the hearing about the work environment causing her stress and making her feel pressured:

> A.   [A]nd sometimes you know jobs with so much pressure that they put on us, especially at Wells Fargo. I wanted to commit suicide. There was a lot of stuff going on.
>
> Q.   So is it the coworkers that were causing most of the stress or was it the job itself or what?
>
> A.   It was both. It was the managers and the coworkers.

[11-1] 48. Plaintiff explained that she finds it difficult to remain in a job for longer than about a month because "that's when chaos kicks off, stress kicks off, pressure

kicks off, antagonistic behavior kicks off." [*Id.*] 47. *See also* [*id.*] 50 (plaintiff agreeing with the ALJ's question about whether taking care of four children and a husband who is injured is causing her stress and stating that it has added to her stress, but focusing back on work and testifying that the worst part is trying to adjust to the way of living like everybody else and conforming to jobs and dealing with work).

Other records show that plaintiff has a history of problems and incidents with coworkers, suggesting that working and interacting with people may be a substantial factor that precipitates or aggravates her symptoms. *See, e.g.*, [11-1] 472, 490, 553, 725. *See also* [*id.*] 348 (plaintiff's function report stating that she is "easily triggered by people"), 352 (function report stating that plaintiff does "not at all" get along with authority figures because "they are abusive" and that she has been fired or laid off from jobs because of problems getting along with other people), 388 (function report stating that plaintiff experiences paranoia because she has "feelings that people are out to get" her and she feels "like there is a conspiracy about" her), 390 (function report stating that plaintiff becomes irritable and argumentative around authority figures). At the hearing, plaintiff also repeatedly testified as to her past difficulties with coworkers. *See, e.g.*, [11-1] 44–45 (describing how she left her job at BMO because she "started being harassed by some of the employees there"), 47 (referring to her jobs in the past where "throughout the whole time I have documentation of the abuse that I dealt with"), 50 ("[T]he things that I was dealing with at work I felt like could be easily handled if people would have just listened to me."). Plaintiff was adamant that she has even tried working in simple jobs that are supposed to have minimal contact with people, but with no success:

> Q.    Okay. So why can't you do a job where you really wouldn't have to work with any coworkers and rarely deal with any kind of manager? Say you were just a hotel cleaner, why can't you do that kind of job?
>
> A.    Because you still have to deal with people.
>
> Q.    No, you really don't have to deal with people. You go in their rooms when there's no people there. So why couldn't you do that?
>
> A.    I tried doing a simple job.
>
> Q.    Okay. Could you answer my question? Why couldn't you do a simple job like that where you wouldn't be around people?
>
> A.    Overall, you still have to interact with people. So no matter what job I have, if I have to come in, punch in, I still have to talk to the manager, I still have to talk to somebody. There's no job where you're not interacting with somebody. I tried every single job that

21

has minimal contact with people. The last job I had at BMO, I was supposed to have minimal contact with people and still – it still went – it still went bad. I was not even supposed to be talking to that many people where they put me and it still went bad.

[11-1] 48–49.

The ALJ's decision did not acknowledge that some of plaintiff's testimony on these issues was consistent with record evidence demonstrating that plaintiff experiences paranoia, mood instability, difficulty controlling anger, hypervigilance, difficulties with social interactions, intrusive and distressing memories, and flashbacks. *See, e.g.*, [11-1] 597, 673, 712, 715, 717–18, 792–93, 797–98, 802, 807; [11-2] 2, 6, 11. *See also* [*id.*] 744 (notes from a group therapy session observing that plaintiff's behavior was overall positive, but she "rapidly became agitated and upset"), 47 (plaintiff's hearing testimony that "every single job that I've worked for I felt like I was on watch"). She even appears to have displayed suspicion and paranoia during the hearing before the ALJ:

> Q. One of the notes from that IOP that was at Alexian Brothers in 2018 and I'm just going to read you some snippets from those notes, say that you visualize yourself as a victim. You spend an exorbitant amount of time and energy perceiving other people are out to harm you. And then they noted that you tend to exaggerate a lot.

> A. So even in group I had a lot of issues, even with that particular person, I know exactly who wrote that. She had a hard time understanding what I was saying and she didn't believe it until I had another person come and say the same thing that I said. So that was her take on it but again in group I had to be moved around a lot . . . . So they had to push me out. And so even in group there was – I had a hard time because they wouldn't listen to me or understand what I was trying to say.

> Q. Well, do you think it's possible that you seem to be stuck in perceiving yourself, in the role of perceiving yourself as a victim?

[*Id.*] 49–50. But the ALJ did not explain why she nevertheless concluded that plaintiff's symptoms were not as disabling as alleged or why she did not credit plaintiff's testimony despite medical evidence supporting it, nor did the ALJ engage with these portions of the record beyond mere summaries and conclusory statements. "The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected." *Moore*, 743 F.3d at 1123.

The record also contains evidence of plaintiff's difficulties in interacting with people in general, which could bear on her ability to interact with the public. For example, one treatment note acknowledged in the ALJ's decision observes that although plaintiff began to gain insight into how her cognitive distortion impacts the way she perceives relationship interactions and her environment, plaintiff "continues to experience suspiciousness of others and anger outbursts." [11-1] 461. In another record, plaintiff discussed her interpersonal problems and included that she "has trouble making connections" because if someone "say[s] something she does not like she will immediately cut them off." [*Id.*] 673. At this visit, plaintiff indicated a desire "to be more skillful in managing stressful situations and interactions." [*Id.*] 677. *See also* [*id.*] 754 (April 2020 therapy note indicating that plaintiff is trying to balance "staying assertive and not getting aggressive when responding to certain situations" and that plaintiff "reports its [sic] hard to 'be the bigger person' when people make insulting comments toward her[]"), 763 (May 2020 group therapy note indicating plaintiff reports on how "she is able to use prayer in dealing with difficult people"), 54 (plaintiff's hearing testimony that she feels like she is talking to people but not being heard, so the biggest reason why she is angry and upset is because she is repeating herself most of the time), 348 (plaintiff's function report stating that she is "easily triggered by people"). Plaintiff's February 2019 function report stated that she becomes "easily annoyed by other people" and she loses her temper more easily than she used to when dealing with people. [*Id.*] 389. Plaintiff testified at the hearing that she gets into verbal altercations with people "a lot," sometimes people she knows and sometimes strangers, and that she had most recently been involved in an altercation with a stranger in line at Costco. [*Id.*] 55.

The ALJ's decision did acknowledge *some* of these portions of plaintiff's testimony in the paragraph summarizing plaintiff's hearing testimony. [11-1] 22–23. However, that is all the ALJ did. The ALJ did not consider these potential aggravating and precipitating factors, nor did the ALJ articulate why she did not weigh the aforementioned records as heavily as, for example, evidence showing that plaintiff "had a good rapport with providers and was described as pleasant and cooperative." [11-1] 20–21 (citing [*id.*] 445, 597, 761). In light of record evidence reflecting that plaintiff is historically difficult with coworkers and strangers, the Court fails to see how plaintiff's success interacting with mental health providers and therapists (who plaintiff likely sees as listening to and helping her rather than as adversarial) discredits plaintiff's allegations as to her severe inability to work and interact with people. The ALJ also pointed to plaintiff's report that "she was starting to relate to others with the help of her children, such as when they get invited to parties or engaging in school functions." [*Id.*] 21 (citing [*id.*] 673). And the ALJ noted that plaintiff "discussed having support from her pastor." [*Id.*] (citing [*id.*] 677). The ALJ similarly found it persuasive that plaintiff is able to "spend time with friends and family, and live with others." [11-1] 20 (citing [*id.*] 346–54, 356–63, 379–80, 381–92). *See also* [*id.*] 24 (noting that plaintiff lives with her husband and four children). As to this latter observation, the ALJ did not explain, and the Court does not

understand, how the ability to live with one's own husband and minor children supports a finding that plaintiff is able to interact with coworkers and the public in a work environment.

All of these particular observations by the ALJ overlook the fact that the more controlled and comfortable environments of home or a therapist's office are quite different from the work setting. "The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work." *Mendez*, 439 F.3d at 362. *See also Hillary L. v. Kijakazi*, No. 21-cv-48, 2022 WL 1617479, at *6 (N.D. Ind. May 23, 2022) (recognizing that "'the work environment is completely different from home or a mental health clinic' for those who suffer from mental disorders"); *Morales v. Apfel*, 225 F.3d 310, 319 (3rd Cir. 2000) ("For a person, such as Morales, who suffers from an affective or personality disorder marked by anxiety, the work environment is completely different from home or a mental health clinic."). The ALJ did not explain how plaintiff's ease and comfort with people who are regular fixtures in her life translates into an ability to appropriately interact with coworkers and the public, particularly in light of the record evidence and plaintiff's testimony that directly contradict such a finding. And the record reflects that even these relationships with close and supportive individuals are not completely immune from plaintiff's psychological impairments and symptoms. Quite a few treatment notes in the record reflect that "family discord" and "marital discord" are recurring issues discussed during plaintiff's therapy sessions. *See, e.g.*, [11-1] 647, 652, 653, 664, 693, 813, 814, 815, 817, 819, 821; [11-2] 1, 3–5, 7–10. *See also* [11-1] 54 (plaintiff's testimony: "I feel like I'm monitored most of the time, even with my husband."), 389 (plaintiff's February 2019 function report stating that she feels anxious and experiences panic attacks around people she knows). Notes from a March 2020 group therapy session indicated that plaintiff "rapidly became agitated and upset, verbalizing her personal struggles at this time as she tries to implement the skills she learns but is not being met with compassion by others, primarily close friends and family." [*Id.*] 744. And a December 2019 group therapy note indicated that plaintiff "had gotten frustrated and confused with her pastor whom appeared to invalidate her with regards to additional supports she was able to provide." [11-1] 728. "The ALJ simply cannot recite only the evidence that is supportive of her ultimate conclusion without acknowledging and addressing the significant contrary evidence in the record." *Moore*, 743 F.3d at 1124.

Despite plaintiff's vehement hearing testimony that she struggles to "deal with" people and notes in the record suggesting certain stress, work, and coworker-related triggers, the ALJ's decision included no discussion of factors that may precipitate and aggravate plaintiff's symptoms or explanation of how such evidence relates to plaintiff's subjective symptom statements or credibility. On remand, the Court instructs the ALJ to consider this regulatory factor in evaluating plaintiff's symptoms/credibility and articulate her assessment in accordance with SSR 16-3p.

### 4. Harmless Error

The ALJ's errors in assessing plaintiff's subjective symptoms are not harmless. "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Engstrand*, 788 F.3d at 660 (quoting *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014)). *See also Allord*, 455 F.3d at 821–22 (identifying these as the two conditions in which an error in the credibility determination can be harmless); *Darlene M.*, 2021 WL 3773291, at *4. Neither of these two circumstances applies to the present case. The Court also notes that the Commissioner has not raised a harmless-error argument. Such an argument is therefore forfeited. *See James M. v. Kijakazi*, No. 20 CV 2082, 2023 WL 3652862, at *7 n.6 (N.D. Ill. May 25, 2023); *Arej v. Sessions*, 852 F.3d 665, 669 (7th Cir. 2017) ("The government has not raised harmless error here, so that argument is waived") (Sykes, J. concurring).

## C. Constitutional Argument

As the Court is already remanding the case for further proceedings as to the ALJ's credibility determination, it need not reach plaintiff's additional constitutional argument.

### Conclusion

For the foregoing reasons, plaintiff's motion to reverse and remand [14] is granted and defendant's motion for summary judgment [18] is denied. The decision of the Social Security Administration is reversed, and, in accordance with the fourth sentence of 42 U.S.C. § 405(g), this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: September 30, 2024**